UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 21-MJ-02326-LOUIS

UNITED STATES OF AMERICA

v.

JORGE CHERREZ MIÑO,

  **Defendant.**
_____/

CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? ___Yes _x_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? ___Yes _x_ No

         Respectfully submitted,

         DANIEL KAHN, ACTING CHIEF
         CRIMINAL DIVISION, FRAUD SECTION
         U.S. DEPARTMENT OF JUSTICE

  By: *Alexander Kramer*
     ALEXANDER KRAMER
     TRIAL ATTORNEY
     Criminal Division, Fraud Section
     U.S. Department of Justice
     Court ID No. A5502240
     99 NE 4th Street
     Miami, Florida 33132-2111
     Tel: (202) 768-1919

FILED BY CG D.C.
Feb 19, 2021
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI, FL

AO 91 (Rev. 08/09)  Criminal Complaint          original

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>JORGE CHERREZ MIÑO<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  21-MJ-02326-LOUIS<br>)<br>)<br>) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___2014-2020___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder bribery proceeds in U.S. currency through bank accounts in order to promote the carrying on of specified unlawful activity and conceal the nature, location, source, ownership, and control of the proceeds |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Olivia Henika, DHS-HSI Special Agent
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date:  February 19, 2021                     _____
                                              *Judge's signature*

City and state:      Miami, Florida           Hon. Lauren F. Louis, U.S. Magistrate Judge
                                              *Printed name and title*

I, OLIVIA HENIKA, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI) and have been so employed since 2019. I am currently assigned to the HSI Office in Key West, Florida. As part of my duties, I investigate crimes involving violations of customs (Title 19, United States Code), immigration (Title 8, United States Code), and other federal laws, which include Anti-Money Laundering (AML) statutes 18 U.S.C. §§ 1956, 1957, and 1960. I have received training on the proper investigative techniques for these violations, including obtaining and analyzing evidence to determine the existence of criminal activity; the use of surveillance techniques; and the application and execution of arrest and search warrants. I have assisted in several investigations that included suspected violations of the above-mentioned AML statutes. I hold a bachelor's degree and a master's degree in Criminology from the University of Florida. I am a graduate of the Criminal Investigator Training Program from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Prior to becoming a Special Agent I was employed as an Intelligence Analyst for the Monroe County Sheriff's Office, assigned to the South Florida High Intensity Drug Trafficking Area (HIDTA), where I assisted with the investigations of drug trafficking and money laundering organizations. In 2018, I became a Certified Anti-Money Laundering Specialist (CAMS), for which my certification is active.

2. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, witness interview notes, my participation in witness interviews, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

3. Your affiant has participated in a criminal investigation into **JORGE CHERREZ MIÑO**, a citizen of Ecuador who is currently located in Mexico. Based on the evidence gathered through this investigation, there is probable cause to believe that from in or around 2014 through in or around 2020, **JORGE CHERREZ MIÑO**, together with others, conspired to launder monetary instruments, in violation of Title 18, United States Code, Section

1956(h), that is: knowing that the property involved in a financial transaction represented the proceeds of specified unlawful activity, namely, a bribery scheme that violated United States and Ecuadorian bribery law, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i).

4. Bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and dd-3, and bribery of a public official of Ecuador, a felony violation of the penal code of the Republic of Ecuador, are specified unlawful activities, pursuant to Title 18, United States Code, Sections 1956(c)(7)(B)(iv) and (D).

**THE U.S. FOREIGN CORRUPT PRACTICES ACT (FCPA)**

5. Your affiant is aware that the FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of influencing a foreign official, inducing a foreign official to take or omit to take certain acts, and securing an improper advantage in order to obtain or retain business for or with, or direct business to any, person. 15 U.S.C. §§ 78dd-1, *et seq.*

6. The FCPA prohibits "domestic concerns"—which include companies that are incorporated in the United States or have their principal place of business in the United States—or any officer, director, employee or agent of such domestic concern or stockholder acting on behalf of such domestic concern, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such

2

foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order assist the domestic concern to obtain or retain business for or with, or direct business to, any person. 15 U.S.C. § 78dd-2(a) and (h)(1)(B).

7. The FCPA also prohibits any "person"—other than a domestic concern—while in the territory of the United States, from corruptly making use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order assist the such person to obtain or retain business for or with, or direct business to, any person. 15 U.S.C. § 78dd-3(a) and (f)(1).

## THE ECUADORIAN PENAL CODE RELATING TO BRIBERY OF A PUBLIC OFFICIAL

8. From my review of an English translation of the Penal Code of the Republic of Ecuador (the "Ecuadorian Penal Code") in effect from at least in or around February 2014 through the present contains the following relevant provision relating to bribery of a public official, as translated from Spanish:

a. Article 280 [Bribery]: Any public servant and any person that acts on behalf of a state power within any of the State's institutions, listed in the Constitution of the Republic, that receives or accepts, directly or through a third party, an improper economic benefit, or any other type of benefit for himself or for a third party, either to carry out, omit, expedite, delay or condition matters related to his or her functions, shall be punished with a term of imprisonment of one to three years. If the public servant executes an act or fails to carry out the proper act, he or she shall be punished with a term of imprisonment of three to five years. If the conduct described is carried out in

3

order to commit another crime, the public servant shall be punished with a term of imprisonment of five to seven years. Any person who in any way offers, gives or promises any public servant a donation, gift, promise, advantage, or improper economic benefit in order for such servant to carry out, omit, expedite, delay, or condition matters related to his or her functions, or in order to commit a crime, shall be punished with the same penalties issued against public servants.

## RELEVANT ENTITIES AND INDIVIDUALS

9. Instituto de Seguridad Social de la Policia Nacional ("ISSPOL") was the Ecuadorian public institution responsible for managing the financial contributions by Ecuadorian police officers toward their social security. ISSPOL was controlled by the government of Ecuador and performed a function that Ecuador treated as its own, and was an "instrumentality" of the Ecuadorian government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A) and dd-3(f)(2)(A).

10. "U.S. Investment Fund Companies," a group of companies whose identities are known to your affiant, were incorporated in Florida. Each of the US Investment Fund Companies was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

11. **JORGE CHERREZ MIÑO**, was a citizen of Ecuador who served as the manager, president, and director of the U.S. Investment Fund Companies. **JORGE CHERREZ MIÑO** was an officer, director, employee, or agent of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(a).

12. "CHERREZ Panama Company 1," a company whose identity is known to your affiant, was a Panama registered company that obtained lucrative ISSPOL investment management business. CHERREZ Panama Company 1 was controlled by **JORGE CHERREZ MIÑO.**

13. "CHERREZ Panama Company 2," a company whose identity is known to your affiant, was a Panama registered company that was controlled by **JORGE CHERREZ MIÑO.**

14. "ISSPOL Official 1," an individual whose identity is known to your affiant, was a citizen of Ecuador who served as the ISSPOL Risk Director from at least in or around 2014 through at least in or around 2019. ISSPOL Official 1 also served on ISSPOL's Investment Committee and had influence over ISSPOL investment decisions. ISSPOL Official 1 was a "foreign official"

4

as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A) and dd-3(f)(2)(A).

## OVERVIEW OF THE SCHEME TO LAUNDER BRIBERY PROCEEDS

15. As described in greater detail below, **JORGE CHERREZ MIÑO** and the U.S. Investment Fund Companies he controlled paid more than approximately $2.6 million to ISSPOL officials—including approximately $1,397,066 for the benefit of ISSPOL Official 1—in exchange for ISSPOL Official 1 and the other ISSPOL officials using their official positions to assist the U.S. Investment Fund Companies, **JORGE CHERREZ MIÑO,** and others to obtain and retain business for **JORGE CHERREZ MIÑO,** CHERREZ Panama Company 1, and others in violation of the FCPA and Ecuador's law against bribery of a public official.

16. In order to conceal and disguise the proceeds of the bribery scheme and with the intent to promote the carrying on of the bribery scheme, **JORGE CHERREZ MIÑO** and ISSPOL Official 1, together with others, among other things, caused bribery proceeds to be laundered through bank accounts in the United States for the benefit of ISSPOL Official 1 and others, in violation of U.S. money laundering laws.

## INVESTMENT TRANSACTIONS

17. From my review of emails, contracts, documents, bank records, witness interviews and from my participation in this investigation, I have learned, among other things, the following:

18. From at least in or around 2014 through at least in or around 2019, ISSPOL Official 1, as the Risk Director of ISSPOL and sitting on ISSPOL's Investment Committee, had influence over ISPSPOL investment decisions, including who ISSPOL hired to invest its funds.

19. In or around December 2015 and January 2016, ISSPOL entered into an agreement with CHERREZ Panama Company 2 ("swap transaction"). This agreement was reviewed and approved by ISSPOL Official 1 and others.

20. The payment streams resulting from the swap transaction demonstrate that **JORGE CHERREZ MIÑO**'s companies received more money earlier and more money overall at the expense of ISSPOL. For example, in 2017, CHERREZ Panama Company 1 received approximately $40.5 million as a result of this swap transaction. By contrast, under the swap transaction, ISSPOL received approximately $20 million in 2017. As a result of such

5

discrepancies, between in or around 2016 and in or around 2019, **JORGE CHERREZ MIÑO,** through his Panama companies, profited approximately $65 million on this swap transaction.

21. CHERREZ Panama Company 1 received its payments resulting from the swap transaction in its bank account in the United States. A portion of that money was transferred into U.S. Investment Fund Companies' bank accounts in the United States.

22. Further, from at least in or around 2014 through at least in or around 2019, ISSPOL and CHERREZ Panama Company 1 entered into bond repurchase transactions whereby CHERREZ Panama Company 1 sold bonds to ISSPOL with a promise to repurchase the bonds at a set date for a set amount that included interest.

23. CHERREZ Panama Company 1 has failed to meet payment obligations to ISSPOL on more than half of the bond repurchase transactions. As of in or around August 2020, approximately $111 million in repurchase agreements were overdue out of a total of approximately $205 million.

## THE BRIBERY AND MONEY LAUNDERING SCHEMES

24. From at least in or around 2014 through at least in or around 2020, **JORGE CHERREZ MIÑO** and the entities he controlled paid more than approximately $2.6 million to ISSPOL officials—including approximately $1,397,066 for the benefit of ISSPOL Official 1—who had influence over ISSPOL's investment decisions.

25. **JORGE CHERREZ MIÑO** directed payments to ISSPOL Official 1 in at least three ways: (1) payments of approximately $419,226 made by check payable to ISSPOL Official 1; (2) payments of approximately $663,000 made to relatives of ISSPOL Official 1 for his benefit; and (3) payments to a U.S.-based bank account in the name of one of the U.S. Investment Fund Companies and for which **JORGE CHERREZ MIÑO** held signatory authority but for which ISSPOL Official 1 held a debit card in his name that he used for purchases and cash withdrawals of approximately $313,840.

26. Your affiant has not identified any legal investments ISSPOL Official 1 had with **JORGE CHERREZ MIÑO** or the companies **JORGE CHERREZ MIÑO** controlled. A review of available financial documents has not uncovered any initial payments or investments made by ISSPOL Official 1 for which **JORGE CHERREZ MIÑO** would be managing or maintaining money on behalf of ISSPOL Official 1.

### A. February 2016 Transfer of $80,000 for the Benefit of ISSPOL Official 1

27. From in or around December 2015 through in or around January 2016, **JORGE CHERREZ MIÑO** and ISSPOL Official 1 exchanged numerous text messages regarding the closing of the swap transaction with ISSPOL.

28. During this timeframe, and continuing after, **JORGE CHERREZ MIÑO** and ISSPOL Official 1 also exchanged text messages regarding **JORGE CHERREZ MIÑO** providing financial benefits to ISSPOL Official 1, and **JORGE CHERREZ MIÑO** provided money for the benefit of ISSPOL Official 1. In addition, **JORGE CHERREZ MIÑO** and ISSPOL Official 1 promoted the carrying on of the bribery scheme and concealed and disguised, among other things, the nature, the ownership, and the control of the proceeds of the bribery scheme by, among other things, causing, and agreeing to cause, payments to be made into, and expenditures out of, a U.S.-based bank account for which **JORGE CHERREZ MIÑO** held signatory authority but for which ISSPOL Official 1 held a debit card in his name that he used for purchases and cash withdrawals.

29. For example, on or about December 31, 2015, ISSPOL Official 1 sent a text message to **JORGE CHERREZ MIÑO** (translated from Spanish): "Thank you for fixing my financial life and that of my family."

30. On or about February 23, 2016, **JORGE CHERREZ MIÑO** caused a transfer via check from a U.S. Investment Fund Companies' bank account in the amount of approximately $80,000 to a relative of ISSPOL Official 1. The relative of ISSPOL Official 1 deposited the check in a U.S.-based bank account.

### B. December 2017 Transfers of Approximately $20,000 for the Benefit of ISSPOL Official 1

31. On or about December 9, 2017, ISSPOL Official 1 directed **JORGE CHERREZ MIÑO** to make payments for his benefit to accounts held by two of his relatives. Specifically, on or about December 9, 2017, ISSPOL Official 1 sent a text message to **JORGE CHERREZ MIÑO** directing him to put "10" into an account for one relative and another "10" into an account for another relative.

32. On or about December 12, 2017, **JORGE CHERREZ MIÑO** caused two separate checks for approximately $10,000 each to be issued from the U.S.-based bank accounts of U.S. Investment Fund Companies to the two relatives identified by ISSPOL Official 1. These checks were deposited in U.S.-based accounts.

7

C.  **June 2018 Transfer of Approximately $189,000 for the Benefit of ISSPOL Official 1**

33. On or about June 14, 2018, **JORGE CHERREZ MIÑO** and ISSPOL Official 1 sent each other text messages regarding ISSPOL investments. During this communication, ISSPOL Official 1 sent a text message to **JORGE CHERREZ MIÑO** with an image of a spreadsheet attached. This spreadsheet showed different ISSPOL investments and a line item for percentages owed to individuals, including an individual identified as "JL." The total owed to JL on this spreadsheet was approximately $289,226.

34. On or about June 15, 2018, **JORGE CHERREZ MIÑO,** caused a U.S-based bank account of U.S. Investment Fund Companies to pay ISSPOL Official 1 approximately $189,226 via check. The check was deposited the same day in the Southern District of Florida. Travel records indicate that both **JORGE CHERREZ MIÑO** and ISSPOL Official 1 were physically present in the Southern District of Florida when the check was signed and deposited.

D.  **May 2019 Transfer of Approximately $40,000 for the Benefit of ISSPOL Official 1**

35. On or about May 2, 2019, **JORGE CHERREZ MIÑO,** caused a U.S-based bank account of U.S. Investment Fund Companies to pay ISSPOL Official 1 approximately $40,000 via check. The check was deposited at a U.S. bank in the Southern District of Florida on May 6, 2019.

E.  **Transfers to "Portafolio JL" Account for the Benefit of ISSPOL Official 1 and to "Portafolio RN" Account for the Benefit of Another ISSPOL Official**

36. In or around November 2014, **JORGE CHERREZ MIÑO** opened a U.S.-based bank account in the name of "Portafolio JL" that was funded by CHERREZ Panama Company 1 and the U.S. Investment Fund Companies. **JORGE CHERREZ MIÑO** had sole signatory authority over the account. **JORGE CHERREZ MIÑO** caused a debit card for this account to be issued to ISSPOL Official 1. Your affiant is not aware of any deposits made by ISSPOL Official 1 into the account.

37. On or about January 12, 2018, while physically located in the Southern District of Florida, **JORGE CHERREZ MIÑO** sent text messages to ISSPOL Official 1 requesting information regarding ISSPOL investments and whether the money had been credited. ISSPOL Official 1 confirmed the money had been credited and **JORGE CHERREZ MIÑO** stated this was (translated from Spanish) "good news." ISSPOL Official 1 stated the amount ISSPOL had to

8

invest and **JORGE CHERREZ MIÑO** told ISSPOL Official 1 he was working on it and sent a text message stating "47908."

38. On or about January 12, 2018, **JORGE CHERREZ MIÑO** caused U.S. Investment Fund Companies to transfer approximately $47,908 into the Portafolio JL account. That same day, **JORGE CHERREZ MIÑO** also caused U.S. Investment Fund Companies to transfer approximately $47,908 into a "Portafolio RN" account. The Portafolio RN account was similar to the Portafolio JL account and was held for the benefit of second ISSPOL official who was involved in approving ISSPOL's investments with **JORGE CHERREZ MIÑO's** companies.

39. Between on or about November 20, 2018 and on or about November 23, 2018, ISSPOL Official 1 made four ATM withdrawals from the Portafolio JL account in Miami, Florida totaling approximately $1,526.

40. On or about February 27, 2019, **JORGE CHERREZ MIÑO**, while in Miami, Florida, withdrew approximately $15,000 cash from the Portafolio JL debit card account to purchase a cashier's check payable to a relative of ISSPOL Official 1.

F.   **Payments to Additional ISSPOL Officials**

41. Between approximately November 22, 2017 and December 19, 2017, **JORGE CHERREZ MIÑO** caused U.S. Investment Fund Companies to transfer approximately $114,164 to an individual who appears to be a third ISSPOL official and who was also the daughter of a senior official at ISSPOL who approved ISSPOL's investments with **JORGE CHERREZ MIÑO's** companies.

42. Similarly, between approximately November 3, 2014 and approximately February 5, 2016, **JORGE CHERREZ MIÑO** caused U.S. Investment Fund Companies to transfer approximately $315,513 for the benefit of a fourth ISSPOL official who had influence over ISSPOL's investment decisions.

43. Based on the foregoing, there is probable cause to believe that, from in or around 2014 through at least in or around 2020, **JORGE CHERREZ MIÑO**, an officer, director, employee, or agent of a "domestic concern" under the FCPA, willfully and corruptly made use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, and promise to make payments for the benefit of ISSPOL officials for the purpose of influencing the ISSPOL officials to use their official capacity, securing an improper advantage, and inducing the ISSPOL officials to use their influence to affect ISSPOL's investment decisions, in

9

order to assist the U.S. Investment Fund Companies in obtaining and retaining business for, and directing business to, **JORGE CHERREZ MIÑO, JORGE CHERREZ MIÑO**'s Panama companies, and others, in violation of Title 15, United States Code, Section 78dd-2.

44. Based on the foregoing, there is also probable cause to believe that, from in or around 2014 through at least in or around 2020, **JORGE CHERREZ MIÑO,** while in the territory of the United States, willfully and corruptly made use of the mails and means and instrumentalities of interstate commerce or took an act in furtherance of an offer, payment, and promise to make payments for the benefit of ISSPOL officials for the purpose of influencing the ISSPOL officials to use their official capacity, securing an improper advantage, and inducing the ISSPOL officials to use their influence to affect ISSPOL's investment decisions, in order to assist **JORGE CHERREZ MIÑO** in obtaining and retaining business for, and directing business to, himself, **JORGE CHERREZ MIÑO**'s Panama companies, and others, in violation of Title 15, United States Code, Section 78dd-3.

45. Based on the foregoing, and based on my review of the Ecuadorian Penal Code, there is also probable cause to believe that the bribery scheme conducted by **JORGE CHERREZ MIÑO**, ISSPOL Official 1, and others as described above, in which **JORGE CHERREZ MIÑO** paid bribes to ISSPOL officials in exchange for, among other things, obtaining and retaining investment business from ISSPOL, was an offense under, *inter alia*, Ecuadorian law prohibiting bribery of public officials.

46. Based on the foregoing, there is also probable cause to believe that, from in or around 2014 through at least in or around 2020, **JORGE CHERREZ MIÑO,** ISSPOL Official 1, and others conspired to commit money laundering. Specifically, there is probable cause to believe that **JORGE CHERREZ MIÑO** conspired with ISSPOL Official 1, and others, to launder bribery proceeds in U.S. currency through bank accounts, including bank accounts in the United States, with the intent to promote the carrying on of specified unlawful activity and in order to conceal the nature, location, source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(h).

## CONCLUSION

Based on the foregoing, I believe that probable cause exists to issue a criminal complaint and arrest warrant charging **JORGE CHERREZ MIÑO** with violating Title 18, United States Code, Section 1956(h).

Your affiant therefore respectfully requests that the Court enter a complaint for the foregoing violations and issue a warrant for the arrest of **JORGE CHERREZ MIÑO**.

_____
OLIVIA HENIKA
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by ___Face Time___ this __19__ day of February 2021.

_____
HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA